**Noreen KOHL and Richard Kohl**

v.

**NEW SEWICKLEY TOWNSHIP ZONING HEARING BOARD**

v.

**William Layton and Barbara Layton, Appellants.**

Commonwealth Court of Pennsylvania.

Argued Nov. 10, 2014.

Decided Jan. 21, 2015.

---

Patrick M. Livingston, Pittsburgh, for appellants.

Matthew D. Monsour, Pittsburgh, for appellees, Noreen and Richard Kohl.

BEFORE: BONNIE BRIGANCE LEADBETTER, Judge, and PATRICIA A. McCULLOUGH, Judge, and JAMES GARDNER COLINS, Senior Judge.

OPINION BY Judge McCULLOUGH.

Barbara and William Layton (Intervenors) appeal from the December 27, 2013 order of the Court of Common Pleas of Beaver County (trial court), which reversed an order of the New Sewickley Township (Township) Zoning Hearing Board (ZHB), concluding that the dog-rescue operation run by Richard and Noreen Kohl (Applicants) was a non-permissible "kennel" under the Township's zoning ordinance (Ordinance) [1] and denying Appli-

---

**1.** In Article III, Section 3.1 of Ordinance, entitled "Meaning of Words," a "kennel" is defined as: "Any structure, pen or area set aside for the breeding, boarding, show, grooming or keeping of dogs, cats or similar domestic animals. For purposes of this Ordi-

cants' request for a variance. The trial court determined that because Applicants did not receive "economic gain" or a profit for their efforts, their dog-rescue operation was not a "kennel" and, therefore, was not a prohibited land use under the Ordinance. Upon review, we conclude that the term "kennel" as used in the Ordinance is ambiguous, and as we must construe that ambiguity in favor of Applicants as the landowners, we affirm.

### Facts and Procedural History

Applicants own and reside on two acres of property at 805 Hartzel School Road, New Brighton, Beaver County, which is located within a suburban residential (R–1) district. For the past eleven years, Applicants have operated a rescue facility for large dogs (typically weighing over 100 pounds) out of their residence named "Gentle Ben's." Applicants obtain—and have obtained—the dogs through animal shelters, kennels, police departments, and individuals, and they keep any dog that is not adopted. The dogs are housed and fed in Applicants' residence and remain there during the night. Applicants use one acre

of their land as a fenced-in area for the dogs to exercise and deposit waste; the waste is collected daily and stored in closed containers. Applicants are licensed by the Pennsylvania Department of Agriculture as a nonprofit kennel pursuant to the Pennsylvania Dog Law (Dog Law).[2] Although Applicants' receive monetary donations or adoption fees and donations in the form of dog food, they do not charge any fees for accepting the dogs and do not derive any profit from the operation of Gentle Ben's. (ZHB's Findings of Fact Nos. 1–7, 32; Trial court op. at 5–7.)

On September 10, 2012, Intervenors, Applicants' adjoining neighbors, made a complaint to the zoning officer regarding the dogs barking. The zoning officer contacted Applicants the next day and informed them that a kennel was not a permitted use under the Ordinance and that they would be required to seek a variance to continue the operation of Gentle Ben's. On December 13, 2012, Applicants filed an application for a variance to operate a nonprofit dog-rescue shelter.[3] (Trial court op. at 7–8.)

---

nance, the keeping of five (5) or more such animals for economic gain shall be deemed a commercial kennel." Ordinance, III–11.

This same section also defines "commercial (business)" as: "Engaging in a business, enterprise, activity or other undertaking related to or connected with trade or commerce in general." Ordinance, III–5.

**2.** Act of December 7, 1982, P.L. 784, *as amended,* 3 P.S. §§ 459–101–459–1205.

"Kennel" is defined in section 102 of the Dog Law as: "Any establishment in or through which at least 26 dogs are kept or transferred in a calendar year, or a boarding kennel as defined in this act." 3 P.S. § 459–102.

**3.** Later in the proceedings, Applicants filed an amended application seeking a special exception in an R–1 district to engage in "Specialized Animal Raising and Care" per the applicable provisions of the Ordinance. The ZHB

eventually denied this request. (*See* ZHB's decision at 911.) On appeal to this Court, Intervenors do not argue that the ZHB's resolution of this issue or the language of those provisions of the Ordinance have a superseding, conflicting, or displacing effect on whether Gentle Ben's is a "kennel" under the Ordinance, the sole issue that Intervenors present before this Court. Because Intervenors do not advance such arguments, they are waived, and we will not consider them *sua sponte* as a basis for reversal. As the Superior Court explained:

[W]e must stress that the appealing party bears the burden of establishing that the trial court's decision is erroneous. *Commonwealth ex rel. Robinson v. Robinson,* 505 Pa. 226, 478 A.2d 800, 804 (1984) (the appellant has the burden to demonstrate the trial court's decree is erroneous due to either the evidence or the law). As a corollary to that precept is the equally important

On January 22, 2013, and March 6, 2013, the ZHB conducted hearings at which Applicants, Intervenors, several neighbors, and Barry Fowler, the Township's zoning officer, testified. (ZHB's decision at 1.)

Applicants presented a folder of information containing numerous photographs of the large dogs and a summary explaining how the dogs were obtained and whether they still reside with Applicants or have been adopted. Applicants also read several letters and emails written by animal shelters and people who support Gentle Ben's and submitted pictures of food that has been donated by dog food companies. When questioned by the ZHB, Applicants stated that the quantity of dogs that they possess varies, usually between twenty-five to forty dogs, and added that not all of the dogs are adoptable and will stay with them for the remainder of their lives. Applicants further stated that the dogs use a doggie door to exit the residence and enter the one-acre area that is fenced in. (ZHB's Findings of Fact Nos. 8–9; Trial court op. at 16.)

Applicants informed the ZHB that they were recently inspected by the Commonwealth's Dog Warden and received positive remarks regarding their operation, and they submitted copies of their 2012 Kennel License and 2013 Kennel License Application to the Dog Law Enforcement Office. Applicants explained that they are the only people who care for and maintain the dogs and they both work, although Applicant Richard Kohl has recently been laid off. (ZHB's Findings of Fact No. 29; Trial court op. at 16.)

Several neighbors gave testimony supporting Gentle Ben's, stating that the dogs are friendly, fun to be around, and are not a nuisance. The neighbors also testified that the dogs do not roam the neighborhood and that the odor of manure used to spray neighboring farm fields contribute more to a foul smell than the dogs' waste. (ZHB's Findings of Fact Nos. 18, 34.)

Fowler testified that the Township does not have an Ordinance limiting "the number of animals a resident can own. If they want to have 2, 10, 20, 25, [the Township has] nothing on the books restricting the number of pets that are privately owned." (Reproduced Record (R.R.) at 113a.) A ZHB member asked Fowler if a kennel must be for-profit to fall under the definition in the Ordinance, and Fowler responded affirmatively. The ZHB member then stated, "So if it's not-for-profit, it's not a kennel." (R.R. at 112a–13a.)

Intervenors testified that they observed Applicants' dogs attacking other dogs and escaping from Applicants' property. Intervenors stated that Applicants' dogs have threatened to attack them and their small dog. In addition, Intervenors testified that they are worried about other wild

concept that an appellate court cannot reverse a court order on the basis of an issue that has not been raised by the appealing party. *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975) (*sua sponte* consideration of issues deprives court of benefit of counsel's advocacy); *Knarr v. Erie Insurance Exchange*, 555 Pa. 211, 723 A.2d 664 (1999) (if appellant fails to present an issue on appeal, Superior Court is not permitted to address it, even if trial court's disposition was fundamentally wrong); *Department of Transportation v. Boros*, 533 Pa. 214, 620 A.2d 1139 (1993) (Commonwealth Court erred in reversing based on issue not raised by appellant); *Phillips Home Furnishings, Inc. v. Continental Bank* [467 Pa. 43], 354 A.2d 542 (Pa.1976) (Superior Court was not permitted to reverse case based on claim not raised by appellant).

*The York Group, Inc. v. Yorktowne Caskets, Inc.*, 924 A.2d 1234, 1246–47 (Pa.Super.2007). *See Ragnar Benson, Inc. v. Hempfield Township Municipal Authority*, 916 A.2d 1183, 1192 (Pa.Super.2007) (holding that an appellate court cannot sua sponte address an issue that it perceives in the record where that issue is not presented at the appeal level).

animals feeding off the dog food stored in Applicants' garage and expressed their concern that the value of their property is depreciating. (ZHB's Finding of Fact No. 16.)

An adjacent neighbor testified that she is troubled about the large dogs, particularly their loud barking and the amount of waste they produce. (ZHB's Finding of Fact No. 19.)

On April 8, 2013, the ZHB issued a decision, stating that it "feels strongly that [Applicants] are doing a commendable service to the animal community in providing the rescue service, and are providing these services for the good of the animals." (ZHB's Finding of Fact No. 36.) However, the ZHB noted that a dog kennel is not permitted as a conditional use within an R–1 district and determined that it did not possess the authority to grant a variance. The ZHB explained:

> The definition of Kennel provided in Section 3.1 of the [Ordinance] states "Any structure, pen or area set aside for the breeding, boarding, show, grooming or keeping of dogs, cats or similar domestic animals. For purposes of this Ordinance, the keeping of five (5) or more such animals for economic gain shall be deemed a commercial kennel." The definition of Commercial (Business) provided in Section 3.1 of the [Ordinance] states "Engaging in a business, enterprise, activity or other undertaking related to or connected with trade or commerce in general." The [ZHB] has determined that Applicants are operating a kennel per the definition provided in the [Ordinance]. This fact is supported by receipt of the 2012 Kennel Application form as well as the 2012 Kennel Inspection form obtained

through the internet on the [Pennsylvania] Department of Agricultural website. Both of these forms identify the facility as a kennel, under the subcategory of Non–Profit Class. Kennels are regulated within Pennsylvania by the Department of Agriculture, Bureau of Dog Law Enforcement.

(ZHB's decision at 8.) As evidenced from its analysis, the ZHB relied predominately, if not solely, on the Dog Law to determine that Applicants operated a "kennel" for purposes of the Ordinance.

On appeal, the trial court, without receiving additional evidence, reversed. As a prefatory matter, the trial court stated that the sole issue presented to it by Applicants was whether Applicants' operation of Gentle Ben's constitutes a kennel and/or a commercial kennel, noting that a kennel is not a use permitted as of right or as a conditional use in an R–1 district. To aid in its construction of "kennel," the trial court looked to section 603.1 of the Municipalities Planning Code (MPC), 53 P.S. § 10603.1, which advises that: "[i]n interpreting the language of zoning ordinances to determine the extent of the restriction upon the use of the property, the language shall be interpreted, where doubt exists as to the intended meaning of the language written and enacted by the governing body, in favor of the property owner and against any implied extension of the restriction." [4] (Trial court op. at 12–13.)

In construing the definition of "kennel" in the Ordinance, the trial court initially discounted the ZHB's reliance on the fact that Gentle Ben's is licensed as a kennel pursuant to the provisions of the Dog Law, noting that the Ordinance makes no reference to the Dog Law and that the defini-

---

**4.** Act of July 31, 1968, P.L. 805, *as amended,* added by the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10603.1.

tion of a kennel in the Ordinance is different from that in the Dog Law. (Trial court op. at 17–18.)

The trial court next determined that Applicants do not operate Gentle Ben's for "economic gain" or a profit, and, although they collect money in adoption fees, it is not enough to cover the expenses to care for the dogs and Applicants have sustained out-of-pocket losses to provide food and veterinarian services for the animals. (Trial court op. at 6, 20.) The trial court concluded that under *Ruley v. West Nantmeal Township Zoning Hearing Board*, 948 A.2d 265 (Pa.Cmwlth.2008), an animal rescue shelter cannot be deemed to be one operated for "compensation" when the owners accept donations and adoption fees and the donations and fees do not result in a net profit and are used to defray the expenses of caring for the animals.[5] (Trial court op. at 18–20.)

The trial court then resorted to dictionary definitions of "breed" (to propagate sexually and usually under controlled conditions), "board" (to provide with regular meals and often also lodging, usually for compensation), "show" (to present (an animal) for judging in a show), "groom" (to clean and maintain the appearance—as the coat of a horse or dog), and "keep" (to lodge or feed for pay; to take care of) to construe the term kennel in the Ordinance and find that "economic gain" is an essential prerequisite. On this basis, the trial court concluded that Gentle Ben's was not a kennel, reasoning as follows:

> No evidence was presented that [Applicants] breed, board, show, groom or keep the dogs pursuant to the plain and ordinary meanings set forth above. [Applicants] do not derive economic gain as a result of maintaining the animals. Neither the zoning ordinance nor another ... ordinance limits the number of dogs that a property owner is permitted. When the term kennel is construed in conjunction ... with the zoning officer's testimony that kennel denotes a for-profit operation, the court concludes that the definition of kennel in the zoning ordinance is not intended to apply to a single-family dwelling in which rescued dogs are maintained until adopted or provided a permanent home by the owners. The above specifications for a kennel imply a use which is commercial in

---

5. In *Ruley*, a landowner operated an animal shelter (at the time containing two dogs and approximately seventy cats) and was found by the ZHB to be in violation of the township's zoning ordinance on the ground that the shelter was a kennel. The ordinance at issue stated, in pertinent part, that a kennel is an establishment operated "for the purpose of ... boarding ... pets for compensation." On appeal, this Court concluded that the evidence was insufficient to establish that the shelter was being operated for compensation:

> No one compensated [the landowner] for housing their animals, and the donations from third parties do not constitute compensation for "housing" [*i.e.*, boarding] because the donations were not assigned a particular use. As explained by [the landowner] in her brief, there was "no evidence of donations and gifts given in return for specific actions. There is no *quid pro quo*."

> According to the uncontradicted testimony of [the landowner's witnesses], most donations are used to cover medical expenses and procedures and have nothing to do with [the landowner's] cost of housing the animals.

> The purpose of [the shelter] is to rescue unwanted cats and dogs and save them from euthanization while a suitable home is found. [The landowner] did not establish [the shelter] to make a living. Indeed, she appears to make a living in order to support [the shelter]. [The landowner] accepts donations to defray the expenses of caring for the animals, but less than ten percent of the donations is ever used for housing expenses, *i.e.*, for food and litter. As such, [the shelter] does not fit within the definition of kennel ...

948 A.2d at 270.

nature and not to a non-profit dog rescue service within a residence.

The zoning ordinance's definition of kennel further requires that the structure, pen or area be "set aside" for one or more of the stated purposes. The evidence reveals that the dogs reside and are fed within [Applicants'] home. The [fenced-in] pens in the rear of the property are utilized by the animals for the deposit of waste and exercising. The dogs remain in the house overnight. The primary use of [Applicants'] residence is as a single-family dwelling and not set aside for any of the purposes in the definition of kennel.

(Trial court at op. at 21–22.) Accordingly, the trial court reversed the ZHB's order.

## Discussion

On appeal to this Court,[6] Intervenors present two issues in their statement of the questions involved: (1) "Whether [the Ordinance's] restriction on 'kennels' in suburban residential zones precludes use of a two-acre residential site as an incorporated, licensed animal rescue operation, keeping between twenty-two and forty large breed dogs?" and (2) "Whether [the trial court] abused its discretion to the extent it found as a fact that a one-acre fenced-in area located on the two-acre residential site was not an 'area set aside' within the Ordinance's meaning of the definition of 'kennel,' insofar as said finding was not supported by substantial evidence?" (Intervenors' brief at 4.)

In the argument section of their brief, Intervenors contend that the trial court erred in interpreting kennel and applying it to the facts of this case. Intervenors assert that a kennel is not permitted in an R–1 district and that the number of dogs Applicants own far exceeds that which can reasonably be deemed an accessory or incidental use of a single-family dwelling. Intervenors maintain that by operating a non-profit kennel licensed by the Department of Agriculture, Applicants implicitly admit that they "keep" at least twenty-six dogs per calendar year. Intervenors argue that the concept of a "kennel" under the Dog Law is substantially similar to that in the Ordinance and the two should be read *in pari materia.*

In addition, Intervenors contend that the trial court erroneously incorporated notions of profit and "economic gain" into the first sentence of the definition of "kennel" and proposes that the verb in the first sentence, "keeping," is broad enough to encompass the situation where owners merely preserve, maintain, or take care of animals on their property. Intervenors also cite the definition of "commercial" in the Ordinance, which defines that term without referencing "economic gain," thus suggesting that Gentle Ben's is alternatively a "commercial kennel." Finally, Intervenors assert that, contrary to the trial court's conclusion, Applicants "set aside" an area for the dogs because the dogs were free to roam the fenced-in, one-acre portion of the land.[7]

■ As an initial matter, we note that dogs are considered to be personal property under Pennsylvania statutory law, the deprivation of which (through state action)

---

6. Where, as here, the trial court takes no additional evidence, our scope of review is limited to determining whether the ZHB committed an abuse of discretion or an error of law. *Hamilton Hills Group, LLC v. Hamilton Township Zoning Hearing Board,* 4 A.3d 788, 792 n. 6 (Pa.Cmwlth.2010).

7. In response, Applicants contend, among other things, that Intervenors waived their particular challenges to the definition of kennel because they failed to raise their proffered interpretations before the ZHB. Due to our disposition, we need not address this issue.

entitles the owners to procedural due process. *Snead v. Society for the Prevention of Cruelty to Animals of Pennsylvania,* 929 A.2d 1169, 1181–82 (Pa.Super.2007), *aff'd* 604 Pa. 166, 985 A.2d 909 (2009). Although a municipality can regulate the number of dogs that a household may own, consistent with its police power, *see Woll v. Monaghan Township,* 948 A.2d 933, 938–39 & n. 6 (Pa.Cmwlth.2008), the Township has not done so here. Presumably, then, Applicants are entitled to possess their dogs and place them for adoption unless their dog-rescue operation meets the definitional criteria of a "kennel" per the Ordinance. The parties do not dispute this point, and, in fact, assume its accuracy for the sakes of their arguments.[8]

■ "The rules of statutory construction apply to ordinances as well as statutes." *In re Holtz,* 8 A.3d 374, 378 (Pa. Cmwlth.2010). The interpretation of a statute or ordinance presents this Court with a pure question of law, which is generally subject to plenary review. *Northampton Area School District v. Zoning Hearing Board of Township of Lehigh,* 64 A.3d 1152, 1157 (Pa.Cmwlth.2013); *Simko v. County of Allegheny,* 869 A.2d 571, 573 n. 3 (Pa.Cmwlth.2005).

■ The primary objective of statutory interpretation is to determine the intent of the enacting legislation. Section 1921 of the Statutory Construction Act of 1972(Act), 1 Pa.C.S. § 1921. In pursuing that end, we are mindful that a statute's plain language generally provides the best indication of legislative intent and, thus, statutory construction begins with examination of the text itself. *Malt Beverages Distributors Association v. Liquor Control Board,* 918 A.2d 171, 176 (Pa.Cmwlth.2007)

(*en banc*), *aff'd* 601 Pa. 449, 974 A.2d 1144 (2009). In reading the plain language of a statute, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." Section 1903(a) of the Act, 1 Pa. C.S. § 1903(a). With respect to zoning matters, "[u]ndefined terms are given their plain meaning, and any doubt is resolved in favor of the landowner and the least restrictive use of the land." *Caln Nether Co., L.P. v. Board of Supervisors of Thornbury Township,* 840 A.2d 484, 491 (Pa.Cmwlth.2004).

■ Further, where the words of the ordinance are ambiguous, courts construe the ordinance in favor of the landowner. *Lench v. Zoning Board of Adjustment of City of Pittsburgh,* 13 A.3d 576, 579 (Pa. Cmwlth.2011). A zoning ordinance is ambiguous if the pertinent provision is susceptible to more than one reasonable interpretation, *Adams Outdoor Advertising, L.P. v. Zoning Hearing Board of Smithfield Township,* 909 A.2d 469, 483 (Pa. Cmwlth.2006), or when the language is vague, uncertain, or indefinite. *Barasch v. Pennsylvania Public Utility Commission,* 516 Pa. 142, 532 A.2d 325, 332 (1987). Finally, it is well settled that "a zoning hearing board's interpretation of its own zoning ordinance is entitled to great weight and deference. Such deference is appropriate because a zoning hearing board, as the entity charged with administering a zoning ordinance, possesses knowledge and expertise in interpreting that ordinance." *Risker v. Smith Township Zoning Hearing Board,* 886 A.2d 727, 731 (Pa.Cmwlth.2005). Similarly, "because [a township's zoning officer] is charged with the administration and execution of the [ordinance], his interpretation of the

---

8. Because the ZHB failed to file a brief in this matter, this Court entered a *per curiam* order on July 17, 2014, precluding the ZHB from filing a brief and participating in oral argument.

969

ordinance is entitled to deference and should not be disregarded unless shown to be clearly erroneous." *McIntyre v. Board of Supervisors of Shohola Township*, 150 Pa.Cmwlth. 15, 614 A.2d 335, 337 (1992).

■ A "kennel" is not a permitted use in an R–1 district. While there are many different types of kennels with varying purposes under the Dog Law,[9] the Dog Law is not incorporated in the Ordinance so the Court's role in this case is to interpret the language that the Township's legislative body utilized to define a kennel. The Ordinance states that a kennel is: **"Any structure, pen or area set aside for the breeding, boarding, show, grooming or keeping of dogs, cats or similar domestic animals. For purposes of this Ordinance, the keeping of five (5) or more such animals for economic gain shall be deemed a commercial kennel."** Ordinance, III–11 (emphasis added).

In conducting our analysis, we observe that the setting in which language is used informs our understanding of the particular language employed. While this Court typically consults dictionaries to ascertain the common and approved usage of words, *see Moonlite Cafe v. Department of Health*, 23 A.3d 1111, 1114 (Pa.Cmwlth. 2011), in this instance a dictionary is not the most useful of tools because the "action words," although defined in a variety of ways, do not account for the primary noun, "dogs," and, therefore, lack definitional precision and fail to account for the unique situation involving dogs. Nonetheless, this Court may draw upon common sense and basic human experience to construe terms, *see Commonwealth v. Bavusa*, 574 Pa. 620, 832 A.2d 1042, 1052 (2003); *Bellefonte Area School District v. Workmen's Compensation Appeal Board (Morgan)*, 156 Pa.Cmwlth. 304, 627 A.2d 250, 253 (1993), *aff'd*, 545 Pa. 70, 680 A.2d 823 (1994), and we do so here.[10]

9. For example:

"Kennel" is defined in section 102 of the Dog Law as: "Any establishment in or through which at least 26 dogs are kept or transferred in a calendar year, or a boarding kennel as defined in this act." 3 P.S. § 459–102.

A "Nonprofit Kennel" is defined in the same section as: "A kennel registered under the laws of this Commonwealth as a nonprofit entity or a nonprofit animal control kennel under sections 901 and 1002. The term shall include kennels operated by approved medical and veterinary schools and nonprofit institutions conducting medical and scientific research, which shall be required to register, but shall not be required to pay any of the license fees set by this act, and which may use their own identification tags for dogs within their kennels without being required to attach tags hereinafter prescribed while dogs are within such kennels, if approved by the secretary." *Id.*

Further, under the Dog Law, a "boarding kennel" is defined in pertinent part as: "Any establishment available to the general public where a dog or dogs are housed for compen-

sation by the day, week or a specified or unspecified time." *Id.* A "commercial kennel" is "[a] kennel that breeds or whelps dogs and: (1) sells or transfers any dog to a dealer or pet shop kennel; or (2) sells or transfers more than 60 dogs per calendar year." *Id.* Finally, a "pet shop-kennel" is "[a]ny kennel or person that acquires and sells dogs for the purpose of resale, whether as owner, agent or consignee, and sells or offers to sell such dogs on a retail basis." *Id.*

Section 206(a) of the Dog Law imposes licensing requirements on kennels: "Any person who keeps or operates a kennel shall, on or before January 1 of each year, apply to the department for a kennel license." 3 P.S. § 459–206.

10. *See* Cass R. Sunstein, Principles, Not Fictions, 57 U. CHI. L. REV. 1247, 1247 (1990) ("The meaning of any 'text' is a function not of the bare words, but of its context and the relevant culture. Because of the context, words sometimes have a meaning quite different from what might be found in *Webster's* or the *Oxford English Dictionary*. Courts do not and should not make a fortress out of the dictionary.") (citation omitted); *see also Nix*

When viewed in the particular context of tasks relating to dogs, we conclude that the gerunds "breeding," "boarding," "grooming," and the verb "show" all connote, in their most commonplace parlance, a financial component. The basic theme running through all of these enumerated undertakings is that the dog serves as the impetus for economic enterprise and the receipt of monetary consideration.[11] Consistent with this common sense interpretation, the last term in the string of the phrase in the first sentence, "keeping," can most reasonably be read to relate to the main subject theme of financial profit. *See McClellan v. Health Maintenance Organization of Pennsylvania*, 546 Pa. 463, 686 A.2d 801, 806 (1996) ("Under our statutory construction doctrine *ejusdem generis* ('of the same kind or class'), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated."); *Commonwealth ex rel. Fisher v. Philip Morris, Inc.*, 4 A.3d 749, 756 n. 9 (Pa. Cmwlth.2010) ("The ancient maxim *'noscitur a sociis'* summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep."). In this sense, the "keeping of dogs"—in order to maintain affiliation with the class of which it is associated—most likely means to possess and maintain the dogs in the context of a financial undertaking.

However, the only specific language in the Ordinance that relates to the profit-obtaining endeavors listed in the first sentence is the term "economic gain" in the second sentence. Indeed, the definitional structure of "kennel" strongly suggests that the legislative body was concerned, not with the amount of dogs that a landowner simply possesses, but with the manner in and extent to which the landowner uses dogs to achieve "economic gain." *See* Ordinance, III–11 ("Any structure . . . set aside for the breeding, boarding, show, grooming or keeping of dogs. . . . The keeping of five (5) or more such animals for economic gain shall be deemed a commercial kennel."). Therefore, one reasonable interpretation of "kennel" is that the activities listed in the first sentence, whether they be the breeding, grooming, keeping of 4 dogs or less, etc., must be done for "economic gain."

If this is not the preferred reading of kennel, it is as equally reasonable as any other, and it is the interpretation proffered by Fowler, the zoning hearing officer. Fowler testified that the Ordinance does not restrict the number of dogs that a landowner can own and that a dog operation must be one conducted for profit or "economic gain" in order to be considered a "kennel." Although it is disputable whether the ZHB officially adopted Fowler's interpretation, the ZHB did not denounce it, so the officer's interpretation must be given at least some weight in the calculus. *See McIntyre*, 614 A.2d at 337.

*v. Hedden*, 149 U.S. 304, 306–07, 13 S.Ct. 881, 37 L.Ed. 745 (1893) (rejecting dictionary definitions and relying instead on "the common language of the people.")

11. For example, it is everyday knowledge that people make arrangements to "breed" dogs, especially purebred, for the sole purpose of receiving monetary consideration for the unique type that is procreated. In return for compensation, people also act as bailees and "board" or take care of dogs, as if running a day-care center or babysitting venture, temporarily for those owners who are at work and more prolonged for those owners who are on vacation. Further, people cut the hair and nails of dogs or otherwise "groom" them, an art form not known or mastered by all, and typically charge a fee for such specialized services.

To be sure, the operative words above could be construed more broadly, and an individual can be said to "keep" a dog by virtue of the fact that the individual possesses the dog and has claimed the dog as his own. But as Applicants astutely note, this interpretation would lead to an absurd result, because anyone who "keeps" or has two dogs would be presumed to have a "kennel." *See MC Outdoor, LLC v. Board of Commissioners of Abington Township,* 78 A.3d 1269, 1275 (Pa.Cmwlth.2013) (stating that in enacting an ordinance it is presumed that the legislative body "did not intend a result that is absurd or unreasonable."). In the absence of definitive language to the contrary, we cannot conclude that this was the paramount intent of the Township's legislative body in enacting the Ordinance and defining a kennel.

■ More importantly, if "keeping" were construed to mean mere possession and ownership, there is no language in the definition of "kennel" that clarifies how many dogs an individual can "keep" before being designated a "kennel" under the Ordinance. Although "dogs" is written in the plural, implying two or more, the absence of a conclusive number leaves an individual guessing, without a sufficient guidepost, at what point his ownership of more than 1 dog qualifies as a kennel. The net result is that the zoning officer and the ZHB are left with unbridled discretion to decide the particular number of dogs, be it 2, 10, or some other figure, that an individual can possesses before that ownership is deemed a kennel. "It is a fundamental rule that an ordinance must establish a standard to operate uniformly and govern its administration and enforcement in all cases, and that an ordinance is invalid where it leaves its interpretation, administration or enforcement to the unbridled or ungoverned discretion, caprice or arbitrary action of the municipal legislative body or of administrative bodies or officials...." *Orwell Township Board of Supervisors v. Jewett,* 132 Pa.Cmwlth. 30, 571 A.2d 1100, 1103 (1990). Therefore, we conclude that the definition of kennel is ambiguous, not only because it is susceptible to two contrasting meanings, but also because the term "keeping" is inherently vague and indefinite.

The basis for the ZHB's interpretation and Intervenors' primary argument resorts to the definition of a kennel in the Dog Law. In pertinent part, "Kennel" is defined in section 102 of the Dog Law as "[a]ny establishment in or through which at least 26 dogs are kept or transferred in a calendar year...." 3 P.S. § 459–102. However, the Dog Law is not incorporated into the Ordinance; the Ordinance does not refer to the Dog Law, *cf. Ruley v. West Nantmeal Township Zoning Hearing Board,* 948 A.2d at 270 (noting that local ordinance explicitly referred to the Dog Law and looking to the definition of "boarding kennel" in the Dog Law to define "boarding"); and unlike the Dog Law's definition of kennel, the Ordinance does not quantify the simple possession of a particular number of dogs within its parameters.

Moreover, the Dog Law does not preempt municipal ordinances and the Dog Law is not "so pervasive and comprehensive as to preclude [a municipality] from exercising its police powers to limit the number of dogs which may be housed in a residential setting." *Muehlieb v. City of Philadelphia,* 133 Pa.Cmwlth. 133, 574 A.2d 1208, 1210–12 (1990). Consequently, the Township is free to restrict the number of dogs permitted in an R–1 district so long as that restriction bears a rational relationship to a health or safety goal of the community. *Woll,* 948 A.2d at 938–39 & n. 6. However, the Township has not done so here, and it cannot now try to

import the Dog Law's definition of a kennel into its Ordinance and rewrite the Ordinance to mean where "26 dogs are kept." Because the definitions of kennel in the Dog Law and the Ordinance are at odds with each other, with the former placing numerical restraints on ownership while the latter does not, the two enactments cannot be read *in paria materia*. *See Cozzone v. Workers' Compensation Appeal Board (PA Municipal/East Goshen Township)*, 621 Pa. 23, 73 A.3d 526, 536 (2013) ("[A]s a fundamental principle, where two parts of a statute relate to the same persons or things, those statutory parts are to be construed and considered concurrently, whenever possible. They are not to be construed as if one part operates to nullify, exclude or cancel the other"); *In re Paulmier*, 594 Pa. 433, 937 A.2d 364, 371 n. 2 (2007) (stating that *in pari materia* applies only where two statutes "can be read as one statute without creating contradiction"). Accordingly, the Dog Law's definition of kennel cannot resolve the ambiguous nature of the Ordinance.

Similarly, the ZHB's and Intervenors' reference to the definition of "commercial" in the Ordinance is unavailing. While the term commercial is defined broadly ("Engaging in a business, enterprise, activity or other undertaking related to or connected with trade or commerce in general"), Ordinance, III–11, it cannot be incorporated into or otherwise expand the phrase "commercial kennel" in the definition of kennel because a "commercial kennel" is explicitly limited to "economic gain." Ordinance, III–11. ("[T]he keeping of five (5) or more such animals **for economic gain shall be deemed a commercial kennel**.") (emphasis added). Indeed, if the term "commercial" in "commercial kennel" was parsed out to re-define a "commercial kennel" to simply signify a kennel generically engaged in commerce, the plain language and concept of "economic gain" would be evis-

cerated and rendered superfluous. *See Latimore Township v. Latimore Township Zoning Hearing Board*, 58 A.3d 883, 887 (Pa.Cmwlth.2013) ("A zoning ordinance should be construed so that none of its language is superfluous."). Here, the ZHB did not find that Gentle Ben's achieved or was operated for "economic gain," and absent such a finding, Gentle Ben's cannot be considered a "commercial kennel," regardless of whether that entity meets the stand alone definition of "commercial" in the Ordinance. Notably, Intervenors do not contest the trial court's conclusion that Applicants are not operating Gentle Ben's for "economic gain," (Intervenors' brief at 11–12), and, in fact, Intervenors conceded at oral argument that Gentle Ben's does not achieve "economic gain" for purposes of the Ordinance. *See Marmo v. Department of Transportation*, 121 Pa.Cmwlth. 191, 550 A.2d 607, 609 (1988) (concluding that the Department was bound by its attorney's concession during trial that a licensee did not refuse to take a blood test for purposes of section 1547 of the Vehicle Code, 75 Pa.C.S. § 1547), *accord Commonwealth v. Wendler*, 162 Pa. Cmwlth. 104, 638 A.2d 377, 378 n. 2 (1994).

Finally, the case law cited by Intervenors is inapposite. In *Hess v. Warwick Township Zoning Hearing Board*, 977 A.2d 1216 (Pa.Cmwlth.2009), this Court interpreted the phrase "accessory use" in an ordinance and concluded that the residential ownership of twenty-one dogs could not be considered customarily incidental to the use of a residence. In *Hoppe v. Zoning Hearing Board of the Borough of Portland*, 910 A.2d 756 (Pa.Cmwlth.2006), we concluded that a landowner did not qualify for a special exception as a "home occupation" where she sought to breed her dogs. In *Sixth Angel Shepherd Rescue v. Borough of Marcus Hook Zoning Hearing Board*, 2012 WL 8678142 (Pa.Cmwlth., No.

589 C.D. 2011, filed June 4, 2012) (unreported), we agreed with the ZHB that the customary meaning of the term "office" and "office use" does not include the keeping, maintaining or housing of dogs. However, in all of these cases, this Court interpreted specific language in an ordinance, which, quite simply, is not present in this case. Accordingly, we conclude that the above case law does not provide us with guidance in resolving the matter at hand.

### Conclusion

For the above-stated reasons, we conclude that the language comprising a "kennel" is facially ambiguous and must be construed in favor of Applicants as the landowners. Therefore, we conclude that the trial court reached the correct result [12] in interpreting the definition of kennel.[13]

Accordingly, we affirm.

### *ORDER*

AND NOW, this 21st day of January, 2015, the December 27, 2013 order of the Court of Common Pleas of Beaver County is affirmed.

**12.** Although our reasoning differs in some respects from that of the trial court, "it is well settled that this Court may affirm the trial court's order on any basis appearing in the record." *Victoria Gardens Condominium Association v. Kennett Township,* 23 A.3d 1098, 1103 n. 10 (Pa.Cmwlth.2011).

**13.** Nonetheless, we note that our decision does not preclude Intervenors or other neighbors from filing common law claims against Applicants based upon the dogs' behavior.